IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01837-RBJ-CBS

PERVAIZ KAISER,
        Plaintiff,
v.

COLORADO DEPARTMENT OF CORRECTIONS,
        Defendant.
_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

        This civil action comes before the court on Defendant's Motion for Summary Judgment

(filed April 29, 2011) (Doc. # 26).  Pursuant to the Order of Reference dated August 18, 2011

(Doc. # 6) and the memorandum dated April 29, 2011 (Doc # 7), this matter was referred to

the Magistrate Judge.  The court has reviewed the Motion, Mr. Kaiser's Response (filed June

27, 2011) (Doc. # 40), Defendant's Reply (filed July 15, 2011) (Doc. # 44), the exhibits and

affidavits, the entire case file, and the applicable law and is sufficiently advised in the

premises.


I.      Standard of Review

        The purpose of a summary judgment motion is to assess whether trial is
necessary. Rule 56(c) provides that summary judgment shall be granted if the
pleadings, depositions, answers to interrogatories, admissions, or affidavits
show that there is no genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. The non-moving party has the burden
of showing that issues of undetermined material fact exist.  A party seeking
summary judgment bears the initial responsibility of informing the court of the
basis for its motion and identifying those portions of the pleadings, depositions,
interrogatories, and admissions on file together with affidavits, if any, that it
believes demonstrate the absence of genuine issues for trial.

*Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121 (D. Colo. 2000) (internal quotation

marks and citations omitted).  In this procedural posture, therefore, the court's "role is simply

to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the

ultimate factfinder, to sustain h[is] claim." *Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) (internal quotation marks and citation omitted).

The Tenth Circuit Court of Appeals has described the standard of review for a summary judgment motion in a lawsuit brought by a plaintiff in his *pro se* capacity:

> For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment. [E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings. Because [Plaintiff] is representing himself, we liberally construe his pleadings; however, we do not act as his advocate.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal quotation marks and citations omitted). While the court must "view the facts in the light most favorable to the plaintiff," *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011), nevertheless, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

II.     Statement of the Case

Proceeding *pro se*, Mr. Kaiser filed his "Title VII Complaint" alleging pursuant to 42 U.S.C. § 2000e-5 that Defendant discriminated against him based on race, color, religion, and national origin. (*See* Doc. # 3 at 2, 11 of 12). Mr. Kaiser does not specify what relief he seeks. (*See id.* at 6 of 12). Defendant moves for summary judgment on the Complaint pursuant to Fed. R. Civ. P. 56, arguing that Mr. Kaiser did not timely file his lawsuit, that he fails to establish a prima facie case of discrimination, and that he fails to establish that Defendant's articulated non-discriminatory reason for terminating his employment was a pretext for discrimination.

The Colorado Department of Corrections ("CDOC") hired Mr. Kaiser on or about July 1, 2006 to work as a probationary Corrections Officer I at the Limon Correctional Facility in

Limon, Colorado.[1]  (*See* Deposition of Pervaiz Kaiser, Exhibit A-1 to Motion (Doc. # 26-1) at 2 of 7).  Later the same month, Mr. Kaiser requested a transfer from Limon to Denver.  (*See* Exhibit A-2 to Motion (Doc. # 26-2) at 1 of 1).  One reason Mr. Kaiser identified for requesting the transfer was that there was no "religious-common-place" within 100 miles of Limon.  Mr. Kaiser did not identify his religion or the type of religious facility which he sought.  CDOC approved Mr. Kaiser's request on July 18, 2006 and transferred him to the Denver Reception and Diagnostic Center (DRDC). (*See id.*).

> "DRDC is the first stop for all offenders sentenced to the Department of Corrections. Staff process, test, and classify offenders entering the system, prior to their placement at one of the Department's permanent facilities. Offenders are given a complete diagnostic evaluation including medical, dental, mental health assessment, and personal needs assessments, as well as academic and vocational testing, initial classification, and a custody level recommendation."

(*See* Affidavit of James Beaudry, Exhibit A-3 to Motion (Doc. # 26-3 at ¶ 4).  Mr. Beaudry "was assigned as the day shift housing Lieutenant," "responsible for the daily operation of four housing units."  (*See* Doc. # 26-3 at ¶ 5).  Mr. Beaudry "supervised seven Sergeants and fifteen Officers, including Mr. Kaiser."  (*See id.*).  Mr. Beaudry was Mr. Kaiser's direct supervisor from August 11, 2006 to May 14, 2007. (*See id.* at ¶ 7).  On August 11, 2006, Mr. Kaiser met with Mr. Beaudry, discussed expectations, and signed his performance plan.  (*See* Doc. # 26-3 at ¶ 9; Doc. # 26-4 at 1 of 3; Performance Plan, Exhibit A-6 to Motion (Doc. # 26-6)).  The Performance Plan stated that "employee will receive a performance improvement plan" if "late to work three times in a rating period."  (*See* Doc. # 26-3 at ¶ 11; Doc. # 26-6 at 1 pf 2).

"Mr. Kaiser's duties were normally split into two parts during his shifts. For half of the shift, he was on the floor in a housing unit, and for the other half, he was in the control room. Mr. Kaiser's shift began at 6:00 a.m. He was supposed to arrive at roll call at 5:45 a.m." (*See* Doc. # 26-3 at ¶ 8).  Mr. Beaudry "kept a Housing Security Personnel Chronological Log on

---

[1]     At the time, Mr. Kaiser's name was Pervaiz Sulehria.  Thus, CDOC documents refer to Plaintiff as Pervaiz Sulehria.  Mr. Kaiser changed his name in 2009.

each person" he supervised.  (*See id.*).  On the log, he "kept notes related to performance." (*See id.*; *see also* Housing Security Personnel Chronological Log, Exhibit A-4 to Motion (Doc. # 26-4)).

In response to observations about Mr. Kaiser's performance made by other supervisors, Mr. Beaudry gave Mr. Kaiser a Performance Documentation Form on October 14, 2006, identifying improvements needed in considering input, utilizing the chain of command, learning correctional terminology, and understanding instructions. (*See* Doc. # 26-3 at ¶¶ 8-9;  Doc. # 26-4;  Performance Review Form, Exhibit A-5 to Motion (Doc. # 26-5)). Mr. Beaudry noted that Mr. Kaiser was late to roll call on October 8, October 21, and November 10, 2006.  (*See* Doc. # 26-3 at ¶¶ 6, 12;  Doc. # 26-4).  In accordance with the requirements of the Performance Plan, on November 14, 2006 Mr. Beaudry presented Mr. Kaiser with a Performance Documentation Form based on the three days he was tardy.  (*See* Doc. # 26-3 at ¶ 12;  Doc. # 26-4;  Performance Documentation Form, Exhibit A-7 to Motion (Doc. # 26-7).  "The Performance Documentation Form directed Mr. Kaiser to arrive at work at his scheduled hour and provide as much notice as possible when he was too sick to work." (*See* Doc. # 26-3 at ¶ 13; Doc. # 26-7 at 1 of 2).  "The Performance Documentation was not a corrective or disciplinary action, but it could have formed the basis of corrective or disciplinary action if Mr. Kaiser did not follow the directives."  (*See id.*).

On November 25, 2006, Mr. Kaiser responded to the allegations that he was late for roll call on three occasions, stating that he on November 11 and October 21, 2006 he was present at roll call when his name was called and that on October 8, he was stuck outside the roll call room due to overcrowding and could not hear his name.  (*See* Doc. # 26-3 at ¶ 14; "Clarification on Performance Improvement," Exhibit A-8 to Motion (Doc. # 26-8)).  Mr. Beaudry did not find Mr. Kaiser's excuses credible and perceived an unacceptable pattern of Mr. Kaiser's late arrival for roll call.  (*See* Doc. # 26-3 at ¶ 14).  In his experience as a supervisor at DRDC, Mr. Beaudry had not encountered other officers who were repeatedly tardy for roll call.  However, if any officer was late for roll call, Mr. Beaudry documented it the

same way for everyone.  (*See* Doc. # 26-3 at ¶ 29).

Mr. Beaudry noted that Mr. Kaiser was late on December 22, 2006.  (*See* Doc. # 26-3 at ¶ 9; Doc. # 26-4).  On December 29, 2006, Mr. Kaiser asked Lt. Beaudry if he could take the next day off to celebrate a religious holiday.  (*See* Doc. # 26-3 at ¶ 15; Doc. # 26-4).  Mr. Beaudry denied the request because one day' notice was too short.  (*See* Doc. # 26-3 at ¶¶ 16-17; Doc. # 26-4).  Mr. Beaudry had previously granted Mr. Kaiser a four-day weekend from January 1, 2007 to January 4, 2007, which had been timely requested.  (*See id.*).  On December 30, 2006, Mr. Kaiser asked Mr. Beaudry for permission to leave work early for the religious holiday.  Mr. Beaudry denied the request for the reason already given.  (*See* Doc. # 26-3 at ¶ 18; Doc. # 26-4).  On December 31, 2006, Mr. Kaiser left a note under Captain Bongirno's door, entitled "RELIGIOUS ISSUE" and stating:

> On 12/29/2006 I requested day off to my supervisor Lt. Beaudry, stating that tomorrow (12/30/06) is my religious day and I wanted to attend religious prayer which he denied. I reported to my post next day (12/30/06). I couldn't see Lt. Beaudry in the roll call room, so I requested Sgt. Harris that I wanted to attend religious prayer at 9:30. Sgt. Harris told me Lt. Beaudry is here and he forwarded my request to him. Lt. Beaudry called me and turned down my request to go to religious prayer.
> This is just for your information without any request of any further action.

Captain Bongirno supported Mr. Beaudry's decision.  (*See* Exhibit A-9 to Motion (Doc. # 26-9); Doc. # 26-3 at ¶ 19;  Doc. # 26-4).

Mr. Kaiser was late for roll call on January 27, 2007.  (*See* Doc. # 26-3 at ¶ 20; Doc. # 26-4).  Mr. Kaiser called in sick on January 31, 2007.  (*See* Doc. # 26-3 at ¶ 21; Doc. # 26-4).  On February 16, 2007, Mr.  Beaudry gave Mr. Kaiser his six-month review for the period July 1, 2006 to December 31, 2006.  Mr. Beaudry gave Mr. Kaiser an overall satisfactory rating with a needs improvement rating in the area of Accountability/Organizational Commitment, which was based on the performance documentation for missing roll call three times in October and November 2006.  (*See* Doc. # 26-3 at ¶ 22; Performance Review Form, Exhibit A-10 to Motion (Doc. # 26-10)).

On Sunday, February 25, 2007, Mr. Kaiser called Mr. Beaudry at home to say he would

not be at work the next day, Monday, because he was not feeling well. (*See* Doc. # 26-3 at ¶ 23; Doc. # 26-4). Mr. Beaudry gave Mr. Kaiser a Performance Documentation Form for this incident because he did not have sufficient sick leave to take a day off and because four out of six times Mr. Kaiser called in sick occurred on a Monday. Mr. Beaudry saw a pattern of abuse of sick time. (*See* Doc. # 26-3 at ¶ 24; Performance Documentation Form, Exhibit A-11 to Motion (Doc. # 26-11)).

On April 5, 2007, Mr. Beaudry noted that Mr. Kaiser's attendance had improved. Mr. Kaiser had no call-offs and only one late arrival due to vehicle issues. Mr. Beaudry observed that for Mr. Kaiser, this was a big improvement that warranted an entry in the chronological log. (*See* Doc. # 26-3 at ¶ 25; Doc. # 26-4). On April 25, 2007, Mr. Beaudry gave Mr. Kaiser his annual performance evaluation for the July 1, 2006 to March 31, 2007 rating period. Mr. Beaudry gave Mr. Kaiser an overall satisfactory rating, with a needs improvement rating in the area of Accountability/Organizational Commitment, which was again based on the performance documentation for missing roll call three times in October and November of 2006 and the March 14, 2007 Performance Document Form for abuse of sick leave. (*See* Doc. # 26-3 at ¶ 26; Doc. # 26-4; Performance Evaluation, Exhibit A-12 to Motion (Doc. # 26-12)).

On April 28, 2007, Mr. Kaiser reported that he had accepted a position with Community Corrections as a Parole Officer trainee. (*See* Doc. # 26-3 at ¶ 27; Doc. # 26-4). On May 4 and May 8, 2007, Mr. Kaiser was late for roll call. (*See* Doc. # 26-3 at ¶ 28; Doc. # 26-4 at 3 of 3). In a close-out evaluation, Mr. Beaudry "gave Mr. Kaiser a satisfactory rating in all competencies because he had improved his punctuality and attendance since receiving the performance improvement plan in March and to give him a fresh start in his new position." (*See* Doc. # 26-3 at ¶ 30; Performance Evaluation, Exhibit A-13 to Motion (Doc. # 26-13)).

On May 15, 2007, Mr. Kaiser transferred to his Parole Officer Trainee position with DOC's Division of Adult Parole. (*See* Affidavit of Melissa Gallardo, Exhibit A-14 to Motion (Doc. # 26-14) at ¶ 5)). During the time period relevant to Mr. Kaiser's claims, Ms. Gallardo supervised parole officers and other staff assigned to Adult Parole, Community Corrections,

and Youthful Offender System, as well as orientation of State Service Personnel Trainees. (*See* Doc. # 26-14 at ¶ 4).  Part of Mr. Kaiser's orientation as a trainee was shadowing senior parole officers throughout the day.  (*See id.*; Affidavit of Tim Hand, Exhibit A-15 to Motion (Doc. # 26-15) at ¶ 6).  On May 15, 2007, Mr. Kaiser reported to the South Metro Parole Office at 3642 S. Galapago Street, Englewood, Colorado for three days of shadowing prior to entering the Peace Officer Standards and Training Academy for Resources for Education, Training, Leadership and Advancement ("RECLA") training.  (*See* Doc. # 26-14 at ¶ 6; Doc. # 26-15 at ¶ 6).

On May 15, 2007, Mr. Kaiser's first day as a parole officer trainee, he left for an early afternoon medical appointment regarding a worker's compensation claim related to his previous work as a correctional officer.  (*See* Affidavit of Pervaiz Kaiser (Doc. # 40-1) at 80 of 81, ¶¶ 10-14).   While Ms. Gallardo expected Mr. Kaiser to return to work after the appointment, he took the rest of the day off.  (*See* Doc. # 26-14 at ¶ 10; Doc. # 40-1 at 80 of 81, ¶¶ 10-14).  Ms. Gallardo held morning briefings each day at which she assigned trainees to senior parole officers.  (*See id.* at ¶ 4).  Ms. Gallardo noticed that Mr. Kaiser was reporting to the morning briefing 15-30 minutes late each day. She noticed his tardiness because everyone else arrived on time, even early, for the briefings.  (*See* Doc. # 26-14 at  ¶ 7).  Ms. Gallardo  noticed that Mr. Kaiser was unavailable for 30-45 minutes at a time without telling anyone where he was going and that he was consistently 15-20 minutes late returning from lunch and breaks.  (*See id.* at ¶ 8).   In Ms. Gallardo's experience, Mr. Kaiser's frequent tardiness, breaks and late returns from lunch were unusual for a parole officer trainee.  (*See id.* at ¶ 9).   On May 18, 2007, Ms. Gallardo discussed informally with Mr. Kaiser his attendance problems.  (*See id.* at ¶ 11).   Ms. Gallardo explained that promptness was necessary and would be expected during Academy training.  She assured Mr. Kaiser that he could take breaks when he needed them, but he must let someone know where he was going and when he would return.  Mr. Kaiser acknowledged that this had been a problem for him in the past but did not offer an explanation for his behavior.  (*See id.*).  Even after Ms. Gallardo's

discussion with Mr. Kaiser, his attendance did not improve.  (*See id.*).

Before leaving for a two-week vacation, Ms. Gallardo brought Mr. Kaiser's performance problems to the attention of Tim Hand, Deputy Director of Operations and Mr. Kaiser's appointing authority.  (*See* Doc. # 26-14 at ¶ 12;  Doc. # 26-15 at ¶¶ 3-5, 7).  "The administration at RECLA, as well as other students in the program, reported that Mr. Kaiser was late to classes, that he abused leave privileges, was on his cell phone frequently, had problems with communication and taking direction, and failed to show commitment to the program." (*See* Doc. # 26-15 at ¶ 7).  Based on these concerns, Mr. Hand contacted Rick Thompkins, CDOC's Manager of Employee Relations/Employee Services, for further information on Mr. Kaiser's work history at CDOC.  (*See* Doc. # 26-15 at ¶ 8).  Upon review of Mr. Kaiser's personnel file, Mr. Thompkins informed Mr. Hand that Mr. Kaiser had received performance documentation forms for lateness and abuse of leave and "needs improvement" ratings in Accountability/Organizational Commitment while working at DRDC.  (*See id.* at ¶ 9).  Mr. Thompkins did not communicate any information to Mr. Hand regarding Mr. Kaiser's race, religion, or national origin.  (*See* Doc. # 26-15 at ¶ 11).

Mr. Hand scheduled a meeting with Mr. Kaiser on May 22, 2007 to discuss his reported unsatisfactory job performance.  (*See* Doc. # 26-15 at ¶ 12; Doc. # 40-1 at 75 of 81).  Before meeting with Mr. Kaiser, Mr. Hand consulted with Mary Kanan, the Assistant Director of Community Legal Affairs and Professional Development of the Division of Adult Parole, Community Corrections and Youth Offender System regarding drafting the letters he delivered to Mr. Kaiser.  (*See* Doc. # 44-1 at ¶ 1; Affidavit of Mary Kanan, Exhibit A-21 to Reply (Doc. # 44-3) at ¶¶ 5, 7).  Ms. Kanan also observed Mr. Kaiser's performance problems.  (*See* Doc. # 44-3 at ¶ 5).  Ms. Kanan recalled "that Mr. Kaiser made an inappropriate comment during Executive Director Ari Zavar[as'] comments to the class."  (*See id.*).  Based on Mr. Kaiser's deficient performance and status as a probationary employee, Mr. Hand decided to terminate

Mr. Kaiser.  (*See* Affidavit of Mr. Hand, Exhibit A-19 to Reply (Doc. # 44-1) at ¶¶ 1-2).[2] However, Mr. Hand would have considered any legitimate excuse Mr. Kaiser had to offer for his unacceptable performance.  (*See id.* at ¶ 2).  Mr. Hand did not discuss with Ms. Kanan or anyone else Mr. Kaiser's race, religion or national origin.  (*See* Doc. # 44-1 at ¶ 1; Doc. # 44-3 at ¶ 8).

During the meeting with Mr. Kaiser on May 22, 2007, Mr. Hand informed Mr. Kaiser that he had decided to terminate his employment due to work performance problems that were reported from several sources.  (*See* Doc. # 44-1 at ¶ 3).  Mr. Kaiser did not deny that he had been late or that he had received performance documentation at DRDC for being late. (*See* Doc. # 26-15 at ¶ 13).  Mr. Kaiser did not mention his job at DRDC, his race, religion, national origin, or discrimination.  (*See id.*).  Mr. Kaiser offered no satisfactory explanation for his performance problems.  (*See* Doc. # 44-1 at ¶ 3).  Mr. Kaiser asked for another chance, but Mr. Hand did not change his decision.  (*See id.*).  Mr. Hand delivered Mr. Kaiser a termination letter stating the reasons: "Abusing leave time, Tardiness, Failure to report to work and failure to notify your supervisor, Poor communication, Failure to take direction well, Lack of overall commitment to the organization, Unsatisfactory job performance."  (*See* Doc. # 40-1 at 76-77 of 81).  Mr. Kaiser filed a Charge of Discrimination with the EEOC on October 6, 2007.  (*See* Doc. # 3 at 11-12 of 12).

III.    Analysis

A.    Timely Filing of Complaint

Defendant moves for summary judgment on the Complaint pursuant to Fed. R. Civ. P. 56 on the ground that Mr. Kaiser did not timely file his lawsuit.  A plaintiff must file his Title VII

---

[2]    "The state personnel board shall establish probationary periods for all persons initially appointed, but not to exceed twelve months for any class or position."  Colo. Const. art. XII, § 13(10).  "After satisfactory completion of any such period, the person shall be certified to such class or position within the personnel system, but unsatisfactory performance shall be grounds for dismissal by the appointing authority during such period without right of appeal."  *Id.*

lawsuit within 90 days of receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC). See 42 U.S.C. § 2000e-5(f)(1).  *See also Jackson v. Continental Cargo-Denver*, 183 F.3d 1186, 1189 (10th Cir. 1999) (90-day time limit starts to run on the date the plaintiff receives the EEOC notice of right to sue).  Unless a Title VII plaintiff files suit within ninety days of receiving a right-to-sue notice from the EEOC, he or she is foreclosed from bringing suit on the allegations made in the EEOC Charge of Discrimination. 42 U.S.C. § 2000e-5(f)(1).

Compliance with Title VII's 90-day period for filing a civil lawsuit is not a jurisdictional prerequisite. *Biester v. Midwest Health Services, Inc.*, 77 F.3d 1264, 1267 (10th Cir. 1996) (citation omitted). Rather, compliance with the ninety-day requirement is a statutory condition precedent that functions like a statute of limitations and is subject to waiver, estoppel, and equitable tolling. *Biester*, 77 F.3d at 1267.  *See also Jarrett v. U.S. Sprint Communications Co.*, 22 F.3d 256, 259-60 (10th Cir. 1994) ("The ninety-day filing limit is not jurisdictional, but is a requirement that, like a statute of limitation, is subject to waiver, estoppel and equitable tolling") (citation omitted);  *Gonzalez-Aller Balseyro v. GTE Lenkurt, Inc.*, 702 F.2d 857, 859 (10th Cir. 1983) (same).  The equitable exceptions to this time limitation are construed narrowly.  *Biester*, 77 F.3d at 1267.  The Tenth Circuit has "taken a strict view of what necessitates equitable tolling."  *Jarrett v. US Sprint Communications Co.*, 22 F.3d 256, 260 (10th Cir. 1994).  Mr. Kaiser does not raise any questions of waiver, estoppel, or equitable tolling.

The 90-day time limit is strictly administered.  *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants");  *Million v. Frank*, 47 F.3d 385, 388 (10th Cir. 1995) ("The existence of the relatively short filing period is clear evidence that Congress intended to require claimants to act expeditiously, without unnecessary delay . . . A plaintiff should be required to assume some minimum responsibility himself for an orderly and expeditious

resolution of his dispute") (internal quotation marks and citation omitted);  *Purrington v. University of Utah*, 996 F.2d 1025, 1031 (10th Cir. 1993) ("A knowing plaintiff has an obligation to file promptly or lose her claim"), *abrogated on other grounds,* 536 U.S. 101 (2002).  By requiring a relatively short filing period, Congress intended for claimants to act efficiently and without unnecessary delay.  *Harvey v. City of New Bern Police Dep't*, 813 F.2d 652, 654 (4th Cir.1987).  *Cf. Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 148 (1984) (filing complaint 96 days after issuance of right-to-sue letter did not satisfy ninety-day requirement); *Mosley v. Pena*, 100 F.3d 1515, 1518 (10th Cir. 1996) (filing complaint 94 days after plaintiff's attorney received right-to-sue letter did not satisfy ninety-day requirement).   When the defendant denies that the precondition has been fulfilled, the burden is on plaintiff to prove that suit was filed within the required period.  *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982).

Mr. Kaiser filed a Charge of Discrimination with the EEOC on October 6, 2007.  (*See* Charge of Discrimination, attached to Complaint (Doc. # 3) at 11 of 12).  On April 26, 2010 the EEOC issued its Dismissal and Notice of Rights.  (*See* Doc. # 3 at 7 of 12).  In the Complaint, Mr. Kaiser alleges that he received the Notice of Rights letter on April 26, 2010. (*See* Doc. # 3 at 2 of 12).  As the Complaint was not sworn to under penalty of perjury, the court does not treat it as an affidavit.  *See Green v. Branson*, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997) (treating complaint sworn to under penalty of perjury as an affidavit).  In his sworn deposition, Mr. Kaiser testified that he received the Notice of Rights letter "roughly within a week or close to a week" of April 26, 2008.  (*See* Doc. # 26-1 at 3 of 7).  One full week after April 26, 2008 was May 3, 2008.  In his Response to the Motion, Mr. Kaiser argues that he received the right-to-sue letter "in or around the first week of May 2010."  (*See* Doc. # 40 at 1 of 82).  Mr. Kaiser's argument is not sworn testimony.

"When the receipt date for an EEOC right-to-sue letter is unknown or disputed, federal courts have presumed various receipt dates ranging from three to seven days after the letter was mailed."  *Lozano v. Ashcroft*, 258 F.3d 1160, 1165 (10th Cir. 2001).  The Tenth Circuit

has "implicitly sanctioned applying either a five-day or a three-day presumption" of receipt after mailing, but has emphasized that this "presumption of receipt is appropriate whenever the actual receipt date is unknown or disputed." *Lozano*, 258 F.3d at 1165.

In order to receive permission to proceed *in forma pauperis*, Mr. Kaiser submitted his Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915 on July 22, 2010. (*See* Doc. # 1). Mr. Kaiser's application to proceed *in forma pauperis* was granted on August 3, 2010 and the Complaint was filed by the Clerk of the Court the same day. (*See* Docs. # 2 and # 3). The ninety-day time limit for filing suit "is tolled between the time a complaint and an application to proceed *in forma pauperis* are received by the Court and the time the Court rules on the application." *El v. Belden*, 360 F. Supp. 2d 90, 93 (D.D.C. 2004) (citations omitted). *See also Dempsey v. Harrison*, 387 F. Supp. 2d 558, 561 (E.D. N.C. 2005) (many "courts have determined that the statutory filing period should be tolled until the petition [to proceed *in forma pauperis*] has been granted") (citations omitted); *Jarrett*, 22 F.3d at 259 (10th Cir. 1994) ("Plainly, the statute of limitation is tolled while the IFP petition is pending.") (citation omitted). Allowing for the tolling of the ninety-day time limit for filing suit between the time Mr. Kaiser filed his application to proceed *in forma pauperis* and the time the court ruled on his application, Mr. Kaiser's Complaint was thus effectively filed on July 22, 2010, 87 days after the right-to-sue notice was issued and within the 90-day time limit for filing suit established by Title VII. On this ground, Defendant's Motion is properly denied.

B.     Discrimination Based on Race, National Origin, and Religion

Mr. Kaiser alleges that he was discharged from his employment based on his "race, Asian/Pacific Islander," his "national origin, Pakistani," and his "religion, Muslim." (*See* Doc. # 3 at 11 of 12). Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer ". . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. §

2000e-2(a)(1).   Mr. Kaiser does not present direct evidence of discrimination.   Thus, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Mr. Kaiser's claim of discrimination.   *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("the Supreme Court has established a three-step burden-shifting framework for determining whether a plaintiff's circumstantial evidence of race discrimination raises an inference of invidious discriminatory intent sufficient to survive summary judgment").   *See also Talmadge v. Hospital Shared Services, Inc.*, 2007 WL 1125661, at * 2 (D. Colo. 2007) ("In analyzing whether plaintiff has made out a viable claim of . . . national origin discrimination pursuant to Title VII," the court employs "the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green.*") (citation omitted).

Under *McDonnell Douglas* the analysis, "the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination."   *Jackson v. City and County of Denver*, 628 F. Supp. 2d 1275, 1284 (D. Colo. 2008).   "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason" for its employment decision.   *Id.*, at 1284-85 (internal quotation marks omitted).   If the defendant employer "presents such a reason, the plaintiff bears the ultimate burden of showing that these proffered reasons are a pretext for unlawful discrimination."   *Id.* at 1285.

Defendant moves for summary judgment on Mr. Kaiser's claims for discriminatory termination on the grounds that: (1) he does not establish all of the elements of a prima facie case of discrimination because his job performance was not satisfactory; (2) Defendant presents legitimate, non-discriminatory reasons for terminating Mr. Kaiser's employment; and (3) Mr. Kaiser does not demonstrate that the Defendant's proffered reasons for terminating his employment were a pretext for discrimination.

1.     Prima Facie Case

To establish a prima facie case of discrimination based on race, religion, or national origin in violation of Title VII, Mr. Kaiser must show that: (1) he belongs to a protected group;

(2) he suffered an adverse employment action (in this case termination), and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). *See also Salguero v. City Of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) ("To prevail on a claim alleging termination on the basis of race, [Plaintiff] must first establish a prima facie case, demonstrating that: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.") (citation omitted).  At the prima facie stage, the plaintiff's burden is "not onerous." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th  Cir. 2005) (internal quotation marks and citation omitted).  *See also Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1171 (10th Cir. 2007) ("Under this formula, a Title VII plaintiff first must establish a prima facie case of discrimination-a burden so light that only the most baseless of claims fails to satisfy it.")*; Annett v. University of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004) ("The burden of establishing a prima facie case [in the McDonnell Douglas framework] is not onerous.") (alteration in original) (internal quotation marks and citation omitted).

Defendant concedes that Mr. Kaiser can show that he is a member of a protected class and that termination of his employment was an adverse action, but asserts that he cannot show that his performance was satisfactory.  "[I]n light of the Supreme Court's admonition that the prima facie case is not to be an onerous or ritualistic burden," the Tenth Circuit concluded that "a plaintiff may make out a prima facie case of discrimination in a discharge case by . . . her own testimony that her work was satisfactory, even when disputed by her employer, . . ." *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992) (internal quotation marks and citation omitted).  Mr. Kaiser presents his affidavit stating that he "was on time every time for all events at training academy and took the breaks when offered and always report back promptly ahead of time." (*See* Doc. # 40-1 at 79-81 of 81, ¶ 19; *see also* ¶¶ 12-18, 20-22). Mr. Kaiser attests that "[d]uring this one and only meeting with Ms. Gallardo, she asked me where I was from and I told her that I was from Pakistan.  She immediately asked me are you

Muslim.  I replied yes.  She said, so you are the guy." (*See* Affidavit of Pervaiz Kaiser (Doc. # 40-1) at 79-81 of 81, ¶ 11).  Given the relatively light burden placed on an employee at the prima facie stage, Mr. Kaiser's affidavit might permit an inference that the termination was discriminatory.  *See, e.g., Moaz v. Philips*, 2011 WL 3331397, at * 5 (D. Colo. 2011) (where supervisor who completed disciplinary notices underlying decision to terminate plaintiff stated that "she can't trust anybody from the Middle East like" plaintiff, court was "prepared to conclude that" plaintiff "has demonstrated that his termination arose in circumstances that could give rise to an inference of discrimination.").  The court thus assumes that Mr. Kaiser has presented evidence that his termination arose under circumstances that could imply discrimination.

   2.   Legitimate, Non-Discriminatory Reasons for Termination of Employment

   In response to Mr. Kaiser's presentation of a prima facie case of discrimination, Defendant has articulated legitimate, non-discriminatory reasons for terminating his employment as a probationary employee based on unreliable attendance, tardiness, and unacceptable performance.  There is evidence that during his brief time as a probationary parole officer trainee, Mr. Kaiser was repeatedly late for daily briefings, late returning from breaks and lunch, was unavailable for duty without telling anyone that he was leaving or when he would return, and that even after Ms. Gallardo discussed these problems with him, his performance did not improve.  (*See* Doc. # 25-14 at ¶ 11).  Mr. Hand learned of Mr. Kaiser's conduct from Ms. Gallardo and others.  (*See* Doc. # 26-15 at ¶ 7; Doc. # 44-3 at ¶¶ 5-7).

   Defendant requires its parole officers to be punctual. (*See* Doc. # 26-15 at ¶ 14).  Their performance affects public and officer safety.  Their job includes attendance at court  and parole hearings.  In parole officer trainees, supervisors and managers look for reliability and the ability to work autonomously.  (*See id.*).  While Mr. Hand learned about Mr. Kaiser's employment history as a correctional officer, he did not terminate his employment based on his performance as a correctional officer.  (*See* Doc. # 44-1 at ¶ 5).  Mr. Hand terminated Mr.

Kaiser's employment based on his performance as a parole officer trainee between May 15 and May 22, 2007. (*See id.*).  Mr. Kaiser's performance as a parole officer trainee and his previous work history as a correctional officer led Mr. Hand to conclude that any lesser discipline than termination would not resolve Mr. Kaiser's performance problems. (*See* Doc. # 44-1 at ¶ 5).  Because Mr. Kaiser did not meet his supervisors' expectations and did not demonstrate the qualities needed for the probation officer position, Defendant had a legitimate nondiscriminatory reason for terminating his probationary employment.

Mr. Kaiser contests some of Defendant's reasons for his termination. (*See* Response (Doc. # 40 at 5 of 82).  Mr. Kaiser presents his affidavit stating that his performance was satisfactory, that he took lunch breaks and other breaks when they were announced and promptly reported back to class, and did not make personal telephone calls. (*See* Doc. # 40-1 at 80-81 of 81, ¶ 8-22).  However, at this stage of the *McDonnell Douglas* analysis, Defendant's burden is "exceedingly light;" the Defendant must merely proffer non-discriminatory reasons, not prove them. *Zamora*, 478 F.3d at 1165-66 (internal quotation marks and citation omitted).  *See also EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992) (at this stage, defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.").  Because Defendant's proffered reasons are not "facially prohibited by Title VII," *Flasher*, 986 F.2d at 1317, the court concludes that the Defendant has articulated a legitimate, nondiscriminatory reason for terminating Mr. Kaiser and has satisfied its burden.

    3.    Pretext

A plaintiff can withstand summary judgment if he presents evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual. *See Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147–49 (2000).  As Defendant articulates a non-discriminatory reason for terminating Mr. Kaiser's employment, the burden reverts back to Mr. Kaiser to show that

"there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal quotation marks and citation omitted).

To show pretext, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) (internal quotation marks and citation omitted). Evidence of pretext may take a variety of forms. *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167-68 (10th Cir. 2007). "One typical method for a plaintiff to prove pretext is by providing direct evidence that the defendant's stated reason for the adverse employment action was false." *Swackhammer*, 493 F.3d at 1167 (citation omitted). "Another common method is a differential treatment argument, in which the plaintiff demonstrates that the employer treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff." *Id.* at 1167-68. *See also Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (employee may show employer's proffered reason to be pretextual in a variety of ways: by showing that the stated reason is false, by showing that the employer acted contrary to a written company policy, or by showing that the employer acted contrary to an unwritten company policy or practice, among others). Once the employer's proffered reason is shown to be pretextual, the factfinder may infer that prohibited

discrimination is the real cause for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519  (1993).  In determining whether the proffered reasons for a decision were pretextual, the court must examine "the facts as they appear to the person making the decision to terminate [Mr. Kaiser]."  *Salguero*, 366 F.3d at 1176 (internal quotation marks and citations omitted).  Mr. Kaiser bears the burden of showing that each reason given by the employer is unworthy of credence.  *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005).

In response to Defendant's Motion, Mr. Kaiser raises factual allegations that: (1) the two jobs he held with DOC were separate and thus his performance as a parole officer trainee "shouldn't be linked to any of his previous jobs. . . ;" (2) he left his job as a corrections officer with a "satisfactory" rating that "clearly establishes that he left the position of Correctional Officer in good standing;" (3) Ms. Gallardo asked and he told her his national origin, Pakistan, and religion, Muslim; thus "DOC was well aware of the religious and affiliation and country of origin of Plaintiff [sic];" (4) he "only took time off once to attend one doctor's appointment with Ms. Gallardo's permission and was not late to work, was not late from breaks or lunch and did not make phone call while working a[t] the Parole Office;" and (5) Defendant had a "'plan' to terminate Plaintiff from his job as early as May 17, 1007." (*See* Doc. # 40 at 2, 4, 7, 8 of 82). The court concludes that the facts identified by Mr. Kaiser do not create a genuine dispute as to any material fact that merits a trial on his claims.

The evidence shows that while Mr. Hand became aware of Mr. Kaiser's performance as a correctional officer, he terminated Mr. Kaiser's employment based solely on his performance as a parole officer trainee. (*See* Doc. # 26-19 at ¶ 5).  Mr. Kaiser's performance history led Mr. Hand to conclude that Mr. Kaiser's performance and behavior problems as a parole officer trainee could not be solved by lesser discipline than termination. (*See id.*).  Mr. Kaiser's own evidence indicates that Defendant first became aware of his national origin and religion when he told Ms. Gallardo on May 15, 2007. (*See* Doc. # 40-1 at 80 of 81, ¶ 11).  Mr. Kaiser does not demonstrate that Mr. Hand's knowledge of his performance history as a

correctional officer creates any inference of discrimination based on his race, national origin, or religion.  Mr. Kaiser has not established that he was terminated based on his performance problems other than while he was a parole officer trainee.  The overall satisfactory rating upon Mr. Kaiser's departure from the corrections officer position did not negate the evidence regarding his punctuality and attendance problems as a corrections officer and later as a parole officer trainee.

Next, even if Mr. Kaiser's factual assertion that "[d]uring this one and only meeting with Ms. Gallardo, she asked me where I was from and I told her that I was from Pakistan.  She immediately asked me are you Muslim.  I replied yes.  She said, so you are the guy" (*see* Doc. # 40-1 at 79-81 of 81, ¶ 11) is accepted as true, he has not established that his termination was based on a discriminatory motive.[3]  Mr. Kaiser's evidence demonstrates no more than Ms. Gallardo's awareness of his national origin and religion.  Mere knowledge is not evidence of discriminatory motive.  Even if Ms. Gallardo's single alleged statement could be characterized as discriminatory, this one isolated remark is "insufficient to demonstrate discriminatory animus."  *Stover v. Martinez*, 382 F.3d 1064, 1077 (10th Cir. 2004) (citations omitted).

To demonstrate a discriminatory motive, a plaintiff must show "a nexus between the allegedly discriminatory statements [and actions] and the defendant's decision to terminate the plaintiff."  *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1281 (10th Cir. 2003) (internal quotation marks and citation omitted).  The deficiencies in Mr. Kaiser's performance were noted by supervisors other than Ms. Gallardo.  Ms. Gallardo did not make the decision to terminate Mr. Kaiser and was on vacation when he was terminated.  There is no evidence that Ms. Gallardo conveyed any discriminatory animus to Mr. Hand, who was the

---

[3]     Ms. Gallardo denies the comments Mr. Kaiser attributes to her.  "When Mr. Kaiser first reported to me at the South Metro Parole Office, I asked him how he pronounced his name. After Mr. Kaiser gave me the correct pronunciation of his name, I said, 'Now I can put a face with the name,' or words to that effect. I never asked him if he was from Pakistan or if he was Muslim, nor did I ever say, 'So, you are that guy?' "

decision-maker.  *See Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85 (1st Cir. 2004) (discussing lack of taint of animus infection)).  Nor is there any evidence that Mr. Hand independently harbored or demonstrated any discriminatory motive toward Mr. Kaiser.  Mr. Hand had information that in the first five days of training and shadowing, Mr. Kaiser was late to classes, abused leave privileges, was on his cell phone frequently, had problems with communication and taking direction, and failed to show commitment to a job where attendance, punctuality, and communication are essential.  Mr. Hand was not aware of and did not discuss Mr. Kaiser's race, national origin, or religion with anyone.  (*See* Doc. # 26-19 at ¶ 6).  Mr. Kaiser has not demonstrated that Mr. Hand had any knowledge of his race, national origin, or religion when he decided to terminate his employment or that Mr. Hand's decision was so meritless that his motivation must be questioned.  Even if Ms. Gallardo or Mr. Hand were mistaken in their assessment of Mr. Kaiser's  performance, there is no evidence that Ms. Gallardo or Mr. Hand did not honestly believe that Mr. Kaiser demonstrated unsatisfactory attendance and punctuality.  *See Locke v. Grady County*, 2011 WL 3648140, at * 5 (10th Cir. Aug. 19, 2011) (facts appearing to decisionmaker at the time provided a legitimate, non-discriminatory reason for firing plaintiff).

Further, Ms. Gallardo's and Mr. Kaiser's differing memories of his time off for a doctor's appointment on May 15, 2007 do not demonstrate a pretext for discrimination.  Ms. Gallardo recalls "that one day Mr. Kaiser told me that he had a follow-up doctor's appointment for a worker's compensation injury sustained in his previous position as a correctional officer. The appointment was scheduled in the early afternoon. I expected Mr. Kaiser to return within a couple of hours. He did not return that day at all, nor did he call to let me know he wouldn't be returning."  (*See* Doc. # 26-14 at ¶ 14).  Mr. Kaiser recalls that "I asked [Ms. Gallardo] permission to attend the follow up appointment.  She asked me where was doctor's office and after learning the location of Concentra Medical Center, Ms. Melissa Gallardo told me that she had plan for me to shadow a Parole Office during her visit to Denver County Jail and get familiar with jail procedures.  Ms. Gallardo directed me to go doctor office after the Denver

County Jail visit was completed.  Ms. Gallardo also directed me to take off after doctor's appointment and she would take care of adjusting my sick time [sic]." (*See* Doc. # 40-1 at ¶ 10).[4]

> To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses us not to act as a "super personnel department" to undo bad employment decisions; instead, it charges us to serve as a vital means for redressing discriminatory ones.

*Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010) (citation omitted). Mr. Kaiser does not demonstrate that his termination was discriminatory based on the different recollections of his absence from work on May 15, 2007.

Finally, Mr. Kaiser argues there was a "plan" to terminate his employment because of his race, national origin, or religion, submitting e-mails between Mr. Hand, Mr. Thompkins, and Ms. Kanan. (*See* Doc. # 40-1 at 68-74 of 81).  The evidence indicates that Mr. Hand and Ms. Kanan consulted with Human Resources staff regarding what courses of action were available to address Mr. Kaiser's performance issues. (*See* Doc. # 44-1 at ¶¶ 1, 4; Doc. # 44-3 at ¶¶ 6-8; Doc. # 26-15 at ¶ 8).  Their communications do not show any discriminatory motivation for Mr. Kaiser's termination.  Mr. Kaiser has not presented evidence that Mr. Hand, Mr. Thompkins, or  Ms. Kanan knew his race, national origin, or religion or discussed his race, national origin, or religion with anyone.  (*See* Doc. # 44-1 at ¶¶ 1, 6 ; Doc. # 44-3 at ¶ 8). There is no evidence of a "plan" to terminate Mr. Kaiser's employment because of his race, national origin, or religion.

IV.    Conclusion

Even assuming that Mr. Kaiser has presented a prima facie case, Defendant has

---

4    Mr. Kaiser attaches extensive documentation of his worker's compensation claim to his Response. (*See* Doc. # 40 at 43-69 of 82).

articulated legitimate, nondiscriminatory reasons for terminating his employment. The court concludes that Mr. Kaiser fails to carry his burden of establishing that Defendant's articulated reasons for terminating his employment were a pretext for discrimination based on his race, national origin, or religion. The evidence he presents is not "sufficient to raise a genuine doubt about Defendant's motivation." *Jones*, 349 F.3d at 1268 (internal quotation marks and citation omitted). The evidence proffered by Mr. Kaiser is not sufficient, even if believed by the ultimate factfinder, to sustain his claims of discriminatory termination based on his race, national origin, and religion. *See Jones*, 349 F.3d at 1265-66 (internal quotation marks and citation omitted). Accordingly,

IT IS RECOMMENDED that Defendant's Motion for Summary Judgment (filed April 29, 2011) (Doc. # 26) be GRANTED and that summary judgment enter on the Complaint (Doc. # 3) in favor of Defendant and against Plaintiff.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th

Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 4th day of January, 2012.

BY THE COURT:

___s/Craig B. Shaffer_____
United States Magistrate Judge