IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-01837-RBJ-CBS

PERVAIZ KAISER,

    Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,

    Defendant.

---

**ORDER GRANTING SUMMARY JUDGMENT**

---

The Court, by Judge Martinez, referred defendant's motion for summary judgment [Doc. #26] to a magistrate judge. On January 4, 2012 Magistrate Judge Shaffer recommended that the motion be granted [#51]. The recommendation is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b). Plaintiff has objected to all portions of that order. The Court therefore reviews the magistrate judge's recommended disposition de novo. Fed. R. Civ. P. 72(b)(3).

## BACKGROUND

**I.**    **Procedural History.**

On August 3, 2010 plaintiff, *pro se*, filed his Title VII Complaint alleging pursuant to 42 U.S.C. § 2000e-5 that defendant discriminated against him based on race, color, religion and national origin. He did not specify what relief he seeks. Defendant sought summary judgment on two grounds; 1) the Complaint was not timely filed pursuant to Title VII and 2) defendant's reasons for terminating plaintiff's employment were legitimate and non-discriminatory.

1

## II.     Facts.

On or around July 1, 2006 the Colorado Department of Corrections ("CDOC") hired Mr. Kaiser[1] to work as a probationary Corrections Officer I in Limon, Colorado.  Later in July plaintiff requested a transfer from Limon to Denver because there was no "religious-common-place" within 100 miles of Limon; Mr. Kaiser did not identify his religion or the type of religious facility he sought.  Defendant approved his request on July 18, 2006 and transferred him to Denver Reception and Diagnostic Center ("DRDC").

At DRDC Lieutenant James Beaudry ("Lt. Beaudry") was assigned to the day shift, including direct supervision of plaintiff from August 11, 2006 to May 14, 2007.  On August 11, 2006 Mr. Kaiser met with Lt. Beaudry to discuss expectations and to sign his performance plan.  The plan stated that "employee will receive a performance improvement plan" if "late to work three times in a rating period."  Mr. Kaiser was expected to arrive for roll call at 5:45 AM and to begin working at 6 AM.  Lt. Beaudry kept a log for attendance and performance purposes for each employee he supervised.

On October 14, 2006 in response to observations about Mr. Kaiser's performance, Lt. Beaudry gave him a Performance Documentation Form identifying improvements needed in considering input, utilizing the chain of command, learning correctional terminology, and understanding instructions.  On November 14, 2006 Lt. Beaudry presented Mr. Kaiser with another Performance Documentation Form based on his tardiness on three days, October 8, October 21 and November 10, 2006, as noted in his performance log.  Although "the Performance Documentation was not a corrective or disciplinary action," it could have formed the basis of such if Mr. Kaiser failed to follow the directives.

---

[1] At the time, Mr. Kaiser's name was Pervaiz Sulehria. Thus, CDOC documents refer to Plaintiff as Pervaiz Sulehria. Mr. Kaiser changed his name in 2009.

Mr. Kaiser claimed that on two of the three dates in question, October 21 and November 10, 2006, that he was on time for roll call but was stuck outside the room and did not hear his name called. Lt Beaudry found his explanations not to be credible. Lt. Beaudry noted that Mr. Kaiser was late again on December 22, 2006. On December 29, 2006 Mr. Kaiser asked Lt. Beaudry to take the next day off to celebrate a religious holiday. The request was denied, because it was untimely. The next day, December 30, 2006, Mr. Kaiser asked Lt. Beaudry for permission to leave early for the religious holiday. His request was again denied for the same reason. The following day Mr. Kaiser left a note entitled "RELIGIOUS ISSUE" for Captain Bongirno, stating:

> On 12/29/2006 I requested day off to my supervisor Lt. Beaudry, stating that tomorrow (12/30/06) is my religious day and I wanted to attend religious prayer which he denied. I reported to my post next day (12/30/06). I couldn't see Lt. Beaudry in the roll call room, so I requested Sgt. Harris that I wanted to attend religious prayer at 9:30. Sgt. Harris told me Lt. Beaudry is here and he forwarded my request to him. Lt. Beaudry called me and turned down my request to go to religious prayer.
>
> This is just for your information without any request of any further action.

Mr. Kaiser was late again on January 27, 2007 and called in sick on January 31, 2007.

On February 16, 2007 Lt. Beaudry gave Mr. Kaiser his six-month review in which he received an overall satisfactory rating with a "needs improvement" rating in the area of Accountability/Organizational Commitment based on his tardiness. On Sunday, February 25, 2007, Mr. Kaiser called Lt. Beaudry at home to tell him he wouldn't be in the next day because he was sick. Noticing a pattern of abuse of sick time based on the timing of his sick calls – four out of six on Mondays – and the fact that he did not have sufficient sick leave to take a day off, Lt. Beaudry issued Kaiser another Performance Documentation Form.

On April 5, 2007 Lt. Beaudry determined that Mr. Kaiser had made a big enough improvement in his attendance to warrant a notation in Lt. Beaudry's log. In his annual performance evaluation of Mr. Kaiser, Lt. Beaudry gave him an overall satisfactory rating, with a "needs improvement" rating in the area of Accountability/Organizational Commitment, again based on the issues discussed previously.

On April 28, 2007 Mr. Kaiser reported that he had accepted a position with Community Corrections as a Parole Officer Trainee. He was late for roll call on May 4 and May 8, 2007. In his close-out evaluation Mr. Kaiser received a satisfactory rating "because he had improved his punctuality and attendance since receiving [his latest] performance improvement plan . . . and to give him a fresh start in his new position."

On May 15, 2007 Mr. Kaiser transferred to his new position. Part of his training was to shadow senior parole officers throughout the day. That day he reported to the South Metro Parole Office in Englewood, Colorado to begin three days of shadowing. After discussing the matter with his direct supervisor, Ms. Gallardo, Mr. Kaiser left for an early afternoon medical appointment. Ms. Gallardo expected Mr. Kaiser to return after the appointment, but he did not.

Each day Ms. Gallardo held morning briefings at which she assigned trainees to senior parole officers. She noticed that Mr. Kaiser was reporting to the morning briefings between 15 and 30 minutes late, in contrast to everyone else who arrived early or on time. Additionally, Ms. Gallardo observed that Mr. Kaiser was unavailable for 30 to 45 minutes at a time without telling anyone of his whereabouts, and that he was consistently 15 to 20 minutes late returning from lunch and breaks. On May 18, 2007 Ms. Gallardo and Mr. Kaiser informally discussed his attendance problems. Mr. Kaiser reportedly acknowledged that these behaviors had been a problem for him in the past, but said nothing further in that regard.

Mr. Kaiser's attendance did not improve. Before leaving for a two week vacation Ms. Gallardo raised the issue of Mr. Kaiser's attendance with Tim Hand, Deputy Director of Operations and Mr. Kaiser's appointing authority. "The administration at RECLA [Resources for Education, Training, Leadership and Advancement], as well as other students in the program, reported that Mr. Kaiser was late to classes, that he abused leave privileges, was on his cell phone frequently, had problems with communication and taking directions, and failed to show commitment to the program." Mr. Kaiser alleges that Ms. Gallardo asked pointed questions regarding his country of origin and religion, after which she said "so you are the guy."

Mr. Hand requested information from CDOC pertaining to Mr. Kaiser's work history. He was informed that Mr. Kaiser had received performance documentation forms for lateness, and abuse of leave, and "needs improvement" ratings in Accountability/Organizational Commitment while working at DRDC. Mr. Hand scheduled a meeting with Mr. Kaiser on May 22, 2007 to discuss his reported unsatisfactory job performance. In anticipation of the meeting Mr. Hand consulted with Mary Kanan, the Assistant Director of Community Legal Affairs and Professional Development of the Division of Adult Parole, Community Corrections and Youth Offender System regarding the letters he eventually gave to Mr. Kaiser. Ms. Kanan commented on Mr. Kaiser's performance problems and recalled "that Mr. Kaiser made an inappropriate comment during [the] Executive Director['s] . . . comments to the class."

Mr. Hand decided to terminate Mr. Kaiser's employment as a probationary employee based on his deficient performance and gave Mr. Kaiser a termination letter which cited the following reasons for his termination: "Abusing leave time, Tardiness, Failure to report to work and failure to notify your supervisor, Poor communication, Failure to take direction well, Lack of overall commitment to the organization, Unsatisfactory job performance." It is unclear whether

5

Mr. Kaiser disputed any of the reasons. He did ask for another chance which Mr. Hand did not give him. Mr. Kaiser filed a Charge of Discrimination with the EEOC on October 6, 2007.

**III.    Conclusions.**

    A.   Timely Filing of Complaint.

Defendant argues that Mr. Kaiser did not timely file his lawsuit. The magistrate judge did not agree. Neither do I.

A Title VII lawsuit must be filed within 90 days of receiving a Notice of Right to Sue. 42 U.S.C. § 2000e-5(f)(1). Because compliance with this requirement is a statutory condition precedent it acts like a statute of limitations and is subject to waiver, estoppel and equitable tolling. *See Biester v. Midwest Health Services, Inc.*, 77 F.3d 1264, 1267 (10th Cir. 1996). *See also Jarrett v. U.S. Sprint Communications Co.*, 22 F.3d 256, 259-60 (10th Cir. 1994). The EEOC issued its Notice of Right to Sue on April 26, 2010. Eighty seven days later, on July 22, 2010, Mr. Kaiser filed a Motion and Affidavit for Leave to Proceed *in forma pauperis* ("IFP"). The running of the 90 day time limit "is tolled between the time a complaint and an application to proceed *in forma pauperis* are received by the Court and the time the Court rules on the application." *EI v. Belden*, 360 F.Supp.2d 90, 93 (D.D.C. 2004). *See Jarrett*, 22 F.3d at 259 ("the statute of limitation is tolled while the IFP petition is pending."). Mr. Kaiser filed his Complaint August 3, 2010, the same day his IFP petition was granted. Accordingly, the complaint was timely.

    B.   Discrimination Based on Race, National Origin and Religion.

It is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42

U.S.C. § 2000e-2(a)(1). Mr. Kaiser claims that he was discharged because of his race, Asian/Pacific Islander; his national origin, Pakistani; and his religion, Islam.

There are two ways to establish discrimination: (1) direct evidence, and (2) the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792 (1973). Mr. Kaiser does not present direct evidence. Therefore, the Court applies the burden-shifting analysis. *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008)(recognizing the applicability of the burden-shifting analysis to race discrimination claims); *Fisher v. Forestwood Co., Inc.*, 525 F.3d 972, 983 (10th Cir. 2008)(recognizing its applicability to claims of religious discrimination); *Talmadge v. Hospital Shared Services, Inc.*, 2007 WL 1125661, at *2 (D.Colo. April 13, 2007)(recognizing its applicability to national origin discrimination cases).

Under the *McDonnell Douglas* analysis the plaintiff has the initial burden of establishing a prima facie case of discrimination. If he does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. If that is done, the plaintiff has the burden of proving by a preponderance of the evidence that the motive was a pretext for intentional discrimination. *McDonnell Douglas,* 411 U.S. at 802-04; *Cone v. Longmont United Hosp. Assoc.*, 14 F.3d 526, 529 (10th Cir. 1994). Defendant attacks plaintiff's complaint at all three steps.

**1. Prima Facie Case**

To establish a prima facie case of discrimination based on race, religion or national origin a plaintiff must show that: (1) he belongs to a protected group; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir.

2005). The defendant has conceded the first two prongs. However, it denies that the challenged action took place under circumstances giving rise to an inference of discrimination.

The burden on plaintiff to show a prima facie case is "not onerous." *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The Tenth Circuit has held that in light of this relatively low standard a plaintiff's own testimony that her performance was satisfactory is sufficient to meet the burden despite any dispute by her employer. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992). The Court finds that Mr. Kaiser's assertions that his work was satisfactory and that he was prompt and timely in his daily job performance combined with his interpretation of Ms. Gallardo's statement sufficient to meet the low burden of establishing a prima facie case.

### 2. Legitimate, Non-Discriminatory Reasons for Termination

Defendant argues that its reasons for terminating plaintiff – his unreliable attendance, tardiness and unacceptable behavior – are legitimate and non-discriminatory. The record demonstrates that Mr. Hand, the ultimate decision-maker, learned of the aforementioned problems from multiple sources. They were brought to his attention by Ms. Gallardo. In her affidavit Ms. Gallardo explained that she discussed – to no avail – the attendance and performance issues with Mr. Kaiser. Next, Mr. Hand inquired into the situation with Ms. Kanan who was present during at least some of the trainings and observed at least some of the problems that formed the basis for Mr. Kaiser's termination. Ms. Kanan explained to Mr. Hand that she had witnessed an inappropriate comment during one of the training presentations, and that she had heard about his attendance issues from others. Doc. 44-3.

Mr. Hand described how punctuality is a necessary trait of a good parole officer because their attendance is required at court appearances and parole hearings. Doc. 26-15:3. He further

explained that "[a] parole officer must also be accountable because the positions are tied to public and officer safety." *Ibid*. Parole officer trainees are observed to determine whether they are reliable, have the ability to work autonomously, "use good judgment and perform at high levels at all times." *Ibid*. Mr. Hand testified that in his experience some trainees are not serious about the structure, and that "if punctuality is a problem early on, it will not improve with time, especially not after the probationary period ends and the trainee is certified in the position." *Ibid*.

Although Mr. Kaiser disputes some of defendant's asserted reasons those challenges are best left for the pretext discussion. At this stage, similar to plaintiff's showing of a prima facie case, the burden on defendant is light; the defendant must only proffer non-discriminatory reasons, not prove them. *Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1224 (10th Cir. 2007)("Rather UTA need only explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.")(internal quotations omitted). In light of this standard and the evidence in the record the Court finds that unreliable attendance, tardiness and unacceptable behavior are legitimate, non-discriminatory reasons for terminating a person's employment.

### 3. Pretext

The burden shifts back to the plaintiff to present "evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010). A plaintiff accomplishes this when he shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted reasons." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005). "The relevant inquiry is not whether [the employer's] proffered reasons were

wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)(internal quotations and citation omitted).

Typical methods of proving pretext are to provide evidence showing that the employer's proffered reasons are false; that the employer treated plaintiff differently than similarly situated employees; or that the employer acted contrary to a written company policy or an unwritten company policy or practice. *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). The Court views "the facts as they appear to the person making the decision to terminate" when determining whether the proffered reasons were pretextual. *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004)(internal quotations and citations omitted). The burden to show that each proffered reason is unworthy of credence lies with plaintiff. *Jaramillo*, 427 F.3d at 1308.

The magistrate judge stated,

> [i]n response to Defendant's Motion, Mr. Kaiser raises factual allegations that: (1) the two jobs he held with DOC were separate and thus his performance as a parole officer trainee "shouldn't be linked to any of his previous jobs. . . ;" (2) he left his job as a corrections officer with a "satisfactory" rating that "clearly establishes that he left the position of Correctional Officer in good standing;" (3) Ms. Gallardo asked and he told her his national origin, Pakistan, and religion, Muslim[sic]; thus "DOC was well aware of the religious and affiliation and country of origin of Plaintiff [sic in original];" (4) he "only took time off once to attend one doctor's appointment with Ms. Gallardo's permission and was not late to work, was not late from breaks or lunch and did not make phone call while working a[t] the Parole Office;" and (5) Defendant had a "'plan' to terminate Plaintiff from his job as early as May 17, 1007."

Recommendation [#51] at 18.

<u>DRDC history</u>. Mr. Kaiser misinterprets Mr. Hand's explanation for looking into his work history at DRDC. While Mr. Hand was aware of that history, he terminated Mr. Kaiser's employment based on plaintiff's performance as a parole officer trainee after

10

problems were brought to his attention by multiple sources. Mr. Hand's experience led him to believe that the types of problems complained of would not improve with time, and thus discipline less than termination would not be appropriate. Furthermore, Mr. Kaiser has not alleged that Mr. Hand was aware of his race, religion or country of origin prior to drafting the termination letter or meeting with Mr. Kaiser.

<u>Satisfactory rating at DRDC</u>. Because Mr. Hand didn't rely on Mr. Kaiser's performance at DRDC as grounds for terminating his employment, his ultimate satisfactory rating there is not relevant.

<u>Ms. Gallardo's statement.</u> Although what she said is disputed, the Court accepts for this purpose Mr. Kaiser's version, i.e., that she asked questions regarding his country of origin and religion and then remarked, "so you are the guy." Knowledge of an employee's race, national origin or religion alone is not evidence of discriminatory motive. *See Stover v. Martinez*, 382 F.3d 1064, 1077 (10th Cir. 2004). Nor is the statement, "so you are the guy," on its face indicative of discriminatory motive. There must be a "nexus between the allegedly discriminatory statements [and actions] and the defendant's decision to terminate the plaintiff." *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1281 (10th Cir. 2003)(internal quotations and citation omitted). As noted previously, there is no evidence that Ms. Gallardo communicated any information regarding plaintiff's race, religion or national origin to Mr. Hand. Furthermore, there is no evidence that Ms. Gallardo was directly involved in the termination of plaintiff's employment. The information upon which Mr. Hand relied came from multiple sources in addition to Ms. Gallardo, and there is no evidence of any discriminatory animus on the part of Ms. Kanan or Mr. Hand. Any allegation of such discriminatory animus would be

purely conclusory or conjectural. While Mr. Kaiser disputes the accuracy of the information upon which Mr. Hand relied, he does not dispute that those were the facts that Mr. Hand relied on at the time. *See Locke v. Grady County*, 2011 WL 3648140 at *5 (10th Cir. Aug. 19, 2011)(facts appearing to decision maker at the time provided a legitimate, non-discriminatory reasons for firing plaintiff).

Doctor's appointment. Mr. Kaiser disputes Mr. Hand's reliance on plaintiff's absence from training when he attended a doctor's appointment with the approval of Ms. Gallardo. While Ms. Gallardo states she thought Mr. Kaiser would return to work following the afternoon appointment and Mr. Kaiser asserts the opposite and in fact did not return, the resolution of such a dispute is inconsequential to the Court's determination. The Court cannot review defendant's decision to terminate Mr. Kaiser's employment to determine whether the decision was "good" or "correct" after all of the facts have been conclusively established. *Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010)(courts are not licensed to act as a "super personnel department to undo bad employment decisions")(internal citations omitted). The issue is limited to whether the reasons given were a pretext for a discriminatory motive.

Plan. Mr. Kaiser's argument that defendant had a plan to terminate his employment from the beginning based on the emails among Mr. Hand, Mr. Thompkins and Ms. Kanan is unpersuasive. As the magistrate judge noted, these emails do not reflect any discriminatory animus and instead only discuss the options available to Mr. Hand in light of Mr. Kaiser's status as a probationary employee and his perceived performance issues. Doc. # 44-1 at ¶¶ 1, 4; Doc. # 44-3 at ¶¶ 6-8; Doc. # 26-15 at ¶ 8. Mr. Kaiser focuses on the accuracy of the information upon which Mr. Hand relied in making his decision. For example, he challenges: Ms. Gallardo's

statement that he was late in the mornings, late returning from breaks and that he disappeared for long-stretches of time; Mr. Hand's lack of specificity with regard to who told him about Mr. Kaiser's performance or the frequency and timing of his absences, and that Mr. Hand gave Mr. Kaiser an opportunity to deny the allegations contained in the termination letter; and Ms. Kanan's email to Mr. Hand on Mr. Kaiser's second day of training stating that she had a "course of action" with regard to Mr. Kaiser's employment.  However, it is not the accuracy of the information but rather the decision-maker's honest reliance upon the information as presented to him at the time of the decision that matters.  *See Locke*, *supra*.

### Order

Because Mr. Kaiser has not raised a genuine dispute of material fact concerning whether his termination might have been motivated by racial, national origin or religious animus, the Court adopts the recommendation of the magistrate judge [#51] and grants defendant's motion for summary judgment [#26].  The case is dismissed with prejudice.

DATED this 7th day of March, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge